# UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT



MANSFIELD HELIFLIGHT, INC.

        Plaintiff,

        v.

FREESTREAM AIRCRAFT USA, LTD.,
and RUDOLPH MELK, JR.

        Defendants.

Case No. 2:16-cv-28

## COMPLAINT

Plaintiff Mansfield Heliflight, Inc. ("Mansfield" or "Plaintiff"), hereby alleges against Defendants Freestream Aircraft USA, Ltd. ("Freestream"), and Rudolph Melk, Jr. ("Melk," collectively with Freestreem, "Defendants"), upon personal knowledge with respect to itself and its own acts, upon information and belief as to all other matters, and with the belief that all matters alleged herein are likely to have evidentiary support after reasonable opportunity for further investigation and discovery. As grounds therefore, Plaintiff states as follows:

### Introduction

1. This action arises out of Defendants' fraudulent scheme to interfere with Mansfield's purchase of a Gulfstream IV aircraft.

2. On or about August 2, 2015, Mansfield signed a contract to purchase a Gulfstream IV bearing serial number 1254 (the "Aircraft") from Punj Lloyd Limited ("PLL"), a seller located in India (the "PLL" or the "Seller").

3. After purchasing the Aircraft, Mansfield intended to resell it for a sizable profit; in fact, it had identified a buyer and negotiated a purchase price.

4.   Just as Mansfield was preparing to close on the purchase and release its funds from escrow, Connie Marrero, Executive Vice President at Freestream, informed Mansfield that Freestream had signed a contract with the same seller for the same aircraft. Ms. Marrero also stated that Freestream had caused a lien to be filed with the Federal Aviation Administration ("FAA") in order to protect its interest in the Aircraft.

5.   Needless to say, Mansfield was surprised by Freestream's sudden appearance and sought clarification from the Seller as to whether it had, in fact, contracted with two buyers for the sale of the same aircraft.

6.   When confronted, the Seller denied Freestream's account. It stated that although it had a purchase contract with another buyer (not Freestream), such contract terminated on July 21, 2015, due to the buyer's inability to come up with the purchase price.  Only thereafter did the Seller enter into the contract with Mansfield.  The Seller also stated that the lien filed with the FAA was fraudulent, and based on a known misrepresentation.

7.   Despite these assurances from the Seller, Freestream's actions effectively foreclosed Mansfield's ability to purchase the Aircraft and resell it as planned.  Although Mansfield had stood to make a significant profit from its purchase and resale of the Aircraft, the clouded title caused by Freestream's fraudulent lien would prevent it from reselling the Aircraft as planned.  Moreover, the terms of Mansfield's financing arrangement prevented closing with a lien against the Aircraft. Freestream, as a frequent participant in aircraft purchase and re-sale transactions was aware of these consequences when it filed the lien.

8.   Mansfield contacted Freestream on or about August 19, 2015, in order to determine how it intended to proceed. Ms. Marrero indicated, for the first time, that Freestream

was not the buyer itself, but rather was representing the buyer in the transaction – what it described as a "back to back sale."

9.   Freestream stated that its buyer's funds were still in escrow, and that the buyer, Rudolph Melk, Jr., had already conducted a pre-buy inspection and was in the process of obtaining ferry permits from the FAA to fly the Aircraft from India to the U.S.  In sum, Ms. Marrero made it clear that neither Freestream nor Melk intended to back away from the deal.

10. Mansfield informed Freestream that it had invested significant time and expenses in its planned purchase and that it did not intend to relinquish its contractual rights unless it was compensated.

11. In response and in acknowledgement of Mansfield's superior claim to the Aircraft, on August 20, 2015, Freestream sent Mansfield an agreement that it had drafted, by which Melk agreed to pay Mansfield $100,000.00 (it later increased this offer to $200,000.00) upon the closing of his purchase of the Aircraft in exchange for Mansfield's agreement to terminate its contract to purchase the Aircraft and remove its purchase money from escrow.

12. Mansfield had stood to make significantly more than $100,000.00 if it had been able to proceed with the purchase and re-sale of the Aircraft, which the fraudulent lien filed by Freestream with the FAA prevented. However, Mansfield chose to accept the offer rather than spend the time and money that would likely have been required to compel Freestream to allow Mansfield to proceed with its purchase.

13. Melk executed the agreement as the Managing Member of an alter ego limited liability company on August 25, 2015.  Thereafter, in reliance on the execution, Mansfield instucted its escrow agent to inform the Seller of the Aircraft that Mansfield was removing its funds from escrow and terminating its contract to purchase the Aircraft.

14. After several weeks of gamesmanship and misdirection by Defendants—which included a fabricated attempt to have Mansfield purportedly act as Defendants' agent in negotiations with the Seller in a separate deal—Mansfield learned that Freestream had purchased the Aircraft in its own name on October 28, 2015. On the very same day, Freestream sold the Aircraft to an entity called Blackjet, LLC.

15. When Mansfield inquired about the payment it had been promised for agreeing to step aside from the deal, Freestream stated that since Mansfield's agreement was conditioned on Melk purchasing the Aircraft, it owed Mansfield nothing.

16. Simply put, Defendants never intended to honor their agreement with Mansfield. It was a ruse. Defendants conspired to induce Mansfield to relinquish its contractual right to purchase the Aircraft with the double-pronged strategy of: (1) filing false documents with the FAA to cloud title to the Aircraft; and (2) promising to pay Mansfield if it would agree to step aside from the deal, without any intent to fulfill that promise.

17. Mansfield was injured twice. First, it was prevented from earning the substantial profit it reasonably expected to receive through the purchase and resale of the Aircraft. Then, adding insult to injury, it was not paid the funds that it was promised in exchange for releasing its claim to the Aircraft.

18. Mansfield relied on Defendants' false statements and has suffered significant monetary damages; namely, the lost opportunity to profit on the resale of the Aircraft for which a buyer had already been identified, as well as the $100,000.00 it was promised by Melk.

19. Mansfield attempted to resolve this matter outside of litigation, but it has received no response from either Freestream or Melk. Accordingly, it is left with no choice but to file the instant suit.

**Parties**

20. Plaintiff Mansfield Heliflight, Inc., is a Vermont corporation, with a principal place of business located at 159 Catamount Drive, Milton, Vermont.

21. Defendant Freestream Aircraft USA, Ltd, is a New Jersey corporation, with a principal place of business located at 200 Fred Wehran Drive, Teterboro Airport, Teterboro, New Jersey 07608.

22. Defendant Rudolph Melk, Jr. is an individual currently residing at 39 Avalon Lane, Bantam, Connecticut 06750.  At all times described herein, Melk was acting as Freestream's agent. Melk's actions and omissions described herein were in the scope of the agency relationship between Melk and Freestream.

**Jurisdiction**

23. Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a) because diversity exists between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs, as established by 28 U.S.C. § 1332(b).

24. This Court has personal jurisdiction over Defendants pursuant to 12 V.S.A. § 913(b), and because both Defendants have ongoing business contacts within Vermont, including with Plaintiff.  Defendant Melk travelled to Vermont in order to meet with Plaintiff at its offices, where he furthered Defendants' conspiracy. Freestream directed significant tortious activities into Vermont in connection with the present dispute.

25. Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(2).

**Factual Allegations**

**I.    Defendants Attempt To Purchase the Aircraft On Behalf of Blackjet, LLC**

26. On or about July 21, 2015, an entity affiliated with Melk entered a contract to purchase the Aircraft from the Seller.  Melk was acting as an agent for Freestream and/or

Freestream's ultimate buyer, Blackjet, LLC ("Blackjet"), and intended to resell the Aircraft to

Blackjet after it was deregistered in India.

27. Defendants, however, failed to deposit the required purchase funds in escrow; as a

result, the contract automatically terminated on the same day.

## II.    Mansfield Contracts To Purchase The Aircraft

28. On or about July 23, 2015, after reaching an agreement with PLL, Mansfield

deposited the full purchase price for the Aircraft into escrow.

29. On August 2, 2015, PLL and Mansfield executed a contract providing for the sale

of the Aircraft to Mansfield  ("Mansfield Purchase Agreement").

## III.    Defendants Prevent Mansfield From Purchasing The Aircraft By Filing a Fraudulent Lien With The FAA

30. Defendants knew that PLL was negotiating Mansfield after their contract was

terminated, and that Mansfield intended to resell the Aircraft.

31. Defendants, however, did not want to lose the opportunity to purchase the

Aircraft, and presumably, the hefty profit that they expected upon resale to Blackjet.

32. Therefore, in order to prevent Mansfield from closing on the purchase of the

Aircraft, Defendants decided to file and, on August 4, 2015, did file a fraudulent lien against the

Aircraft with the FAA Registry in Oklahoma City ("Fraudulent FAA Lien").

33. The Fraudulent FAA Lien falsely stated that PLL owed Melk over $400,000.00

for "NON payment of services performed."  Neither Melk nor Freestream had performed any

services associated with the Aircraft at the time the lien was filed.

34. On August 14, 2015, Mansfield's escrow agent was contacted by Connie Marrero

Executive Vice President of Freestream. Ms. Marrero falsely informed the escrow agent that

Freestream also had a contract to purchase the Aircraft from PLL, and that Freestream had filed a lien with the FAA in order to protect its contractual rights.

35. On or about August 15, 2015, Mansfield contacted Freestream directly to inquire about the Fraudulent FAA Lien. Freestream stated that it had a valid purchase agreement for the Aircraft that predated Mansfield's.

36. The Seller, however, denied Freestream's account. In an email dated August 17, 2015, PLL stated that it had never entered into an agreement with Freestream. It said that it had signed a contract with Rudolph Melk, Jr., but that Melk had failed to perform by the date specified in the contract; thus, the agreement was void.

37. In addition, PLL stated that the Fraudulent FAA Lien was premised on a blatant misrepresentation, as neither Melk nor Freestream had ever performed any services on the Aircraft.

38. On a phone call on August 19, 2015, Freestream admitted that Melk was the actual buyer. Freestream also made it clear that Melk had money in escrow, was in India, and intended to move forward with the purchase of the Aircraft.

39. Thus, although Mansfield wanted to close its purchase of the Aircraft, and PLL wanted to sell it to Mansfield, Defendants' filing of the Fraudulent FAA Lien, and their insistence on bullying PLL into closing the deal with Melk made that impossible. Mansfield's financers would not agree to fund the purchase of the Aircraft as long as there was a $400,000 lien against it. Moreover, the buyer that Mansfield had identified to purchase the Aircraft also would have backed out of the deal as a result of the Fraudulent FAA Lien.

40. Having achieved their goal of interfering with Mansfield's contract to purchase the Aircraft, Defendants moved to the next step in their conspiracy – fraudulently inducing Mansfield to relinquish its contract right and remove its deposit on the Aircraft from escrow.

**IV.    Freestream and Melk Conspire to Induce Mansfield to Relinquish Its Contract**

41. Mansfield told Freestream on August 19th that it would not walk away from its legitimate contractual rights without being compensated for the time and expense it had invested in its anticipated aquisition.

42. In response and in implicit acknowledgement of Mansfield's superior rights to the Aircraft, on or about August 20, 2015, Freestream informed Mansfield that Melk would pay Mansfield $100,000.00 if it would agree to terminate its purchase agreement with PLL, and withdraw its deposit from escrow.

43. Given the uncertainty created by the Fraudulent FAA Lien, the significant costs that it had invested in its planned purchase of Aircraft, and the large amounts of time and money that would be required to take action to force Defendants' to withdraw the Fraudulent FAA Lien and their bogus claim to the Aircraft, Mansfield agreed to accept this payment to walk away from its deal, assuming that Melk would commit to those terms in writing.

44. Freestream provided Mansfield with a draft agreement by which Melk, through his alter ego, Lima Mike Bravo, LLC ("LMB"), agreed to pay Mansfield $100,000.00 once LMB closed on the purchase of the Aircraft, in exchange for Mansfield's termination of its purchase agreement.

45. Although Mansfield was unclear of Melk's role in the transaction, Defendants represented repeatedly that LMB was the entity that would purchase the Aircraft from PLL.

46. With Melk's agreement to pay $100,000.00, Mansfield honored its end of the bargain.  On August 25, 2015, at Mansfield's instruction, its escrow agent informed PLL that

Mansfield was terminating the Mansfield Purchase Agreement, and Mansfield withdrew its deposit from escrow.

47. Defendants represented that they expected LMB's purchase to close as early as the same day, August 25, 2015; however, the closing never occurred.

48. On August 26, 2015, Mansfield spoke with PLL's attorney in the United States. PLL's attorney stated that Melk had, by way of the Fraudulent FAA Lien, tried to extort PLL into selling him the Aircraft. PLL's attorney said that Melk was a broker, and that he intended to sell the Aircraft to someone else immediately after the purchase. The attorney also stated that he was working on a deal whereby Melk would be returned his non-refundable deposit in exchange for his agreement to withdraw the Fraudulent FAA Lien.

49. PLL's attorney stated that, given Defendants' misrepresentations and unlawful conduct, PLL had no intention of selling Defendants the Aircraft.

## V.    Freestream and Melk Conspire to Tarnish Mansfield's Credibility in Order to Close the Sale

50. Although Freestream and Melk succeeded in their efforts to induce Mansfield to relinquish its contract right, because of the lack of integrity with which Defendants had conducted themselves in the transaction, PLL was unwilling to sell Defendants the Aircraft.

51. Furthermore, Mansfield had offered to pay more for the Aircraft than Defendants; therefore, PLL still held out hope that it would be able to sell the Aircraft to Mansfield once the Fraudulent FAA Lien was released.

52. As a result, Defendants decided to tarnish Mansfield's credibility with PLL so that PLL would be willing to sell them the Aircraft.

53. To achieve this goal, on or about September 1, 2015, Defendants informed Mansfield that they wanted Mansfield to negotiate a deal directly with PLL to purchase the

Aircraft. After Mansfield's purchase, Defendants wanted Mansfield immediately to sell the Aircraft to Melk. In exchange for this arrangement, Defendants offered to pay Mansfield an additional $100,000.00, on top of the original $100,000.00 promised, for a total of $200,000.00.

54. Desirous of finally achieving resolution of the matter, Mansfield agreed to the arrangement, trusting that Defendants would, this time, act with integrity.

55. On or about September 11, 2015, Mansfield executed a new agreement with Melk that enabled it to negotiate to purchase the Aircraft on Melk's behalf. Since Mansfield was unable to obtain financing for the Aircraft due to Defendants' filing of the Fraudulent FAA Lien, it informed Melk that Defendants would need to deposit all of the funds for purchase into escrow.

56. With Defendants' written agreement, Mansfield used its goodwill with PLL to negotiate a new deal to purchase the Aircraft.

57. On September 25, 2015, Melk travelled to Vermont to meet with Mansfield at its facilities in Milton in order to discuss the purchase of the Aircraft. Melk indicated that he was still trying to get his buyers on board – making it explicit for the first time that neither he nor Freestream was the ultimate buyer – but that he expected to have agreement from all shortly.

58. Mansfield again stated that unless Melk was able to put funds in escrow soon, the deal would fall apart, as PLL was now questioning Mansfield's ability to close.

59. On September 30, 2015, Melk sent Mansfield a purchase agreement for the sale of the Aircraft from Mansfield to Melk. Instead of using LMB to purchase the Aircraft from Mansfield, Melk named SilverStar Aviation, LLC ("SilverStar") as purchaser, yet another corporate alter ego registered to an address at Melk's home in Connecticut.

60. Melk stated that the parties could update the commission side letter to reflect the change to the SilverStar entity, and the obligation of SilverStar to pay Mansfield upon completion of the sale.

61. Shortly thereafter, Mansfield returned the agreement to Melk with edits.

62. Over the course of the next two weeks, Melk stalled when pressed by Mansfield about his delays, and was likewise noncommittal when asked about the availability of funds for the purchase of the Aircraft.

63. For example, on October 7, 2015, after Mansfield inquired about the execution of the purchase agreement, Melk stated that it was with legal and that he was at their mercy.

64. On or about October 13, 2015, Mansfield again informed Melk that unless he placed funds in escrow to show his commitment to the deal, the transaction would fall apart.

65. Mansfield never heard from Melk again.

## VI.    Freestream Covertly Signs a Deal to Purchase the Aircraft Directly from PLL

66. With PLL now questioning whether Mansfield intended to close the deal it had negotiated on behalf of Melk, Defendants were able to make their move.

67. As it was unable to reach Melk, on October 16, 2015, Mansfield contacted Ms. Marrero to find out whether Defendants intended to go through with the purchase of the Aircraft. Ms. Marrero responded by stating that she was out of the country and between flights, thereby avoiding the question.

68. In fact, on that very same day and unbeknownst to Mansfield, Freestream signed a contract to purchase the Aircraft directly from PLL.

69. Despite entering its own deal with PLL for the purchase of the Aircraft, Freestream continued to mislead Mansfield, seeking to sideline it until Defendants' purchase was finalized.

70. On October 19, 2015, when pressed again by Mansfield for information, Ms. Marrero responded by saying that the deal was in Melk's hands, and that Freestream was no longer involved in the purchase of the Aircraft.

71. On October 20, 2015, after Mansfield contacted her again to inquire about the status of the transaction, Ms. Marrero again responded that Freestream had stepped aside so that Mansfield and Melk could finalize the deal.

72. Through constant foot-dragging and misdirection, Defendants were able to conceal from Mansfield their true aim: to purchase the Aircraft from PLL directly, after convincing PLL that Mansfield was unable to come up with the funds needed to close, funds that Melk had falsely promised he would provide.

73. On October 28, 2015, Freestream closed on its purchase of the Aircraft from PLL and, on the very same day, sold it to the buyer it had been representing all along; Blackjet, LLC.

74. Shortly thereafter, when Mansfield learned of the Freestream purchase, it contacted Ms. Marrero to inquire about the payment it had been promised in order to relinquish its right to purchase the Aircraft.

75. Ms. Marrero stated that Freestream did not owe Mansfield any money as Mansfield's agreement was with Melk.

76. Mansfield repeatedly contacted Melk via email and telephone. He never responded.

77. Thus, the true extent of Defendants' fraud was only revealed to Mansfield after it was complete.

78. From the beginning, Melk acted as Freestream's agent in order to facilitate the sale to Blackjet, the ultimate purchaser.

79. Both Melk and Freestream earned commissions as a result of the sale of the Aircraft to Blackjet.

80. Defendants never intended to pay Mansfield for relinquishing its contractual rights since Melk never intended to purchase the Aircraft with the corporate alter ego entities that he used to promise payment to Mansfield.

81. Once Mansfield learned the true extent of Defendants' fraud, however, it was too late. As a result of its reliance on Defendants' false statements, Mansfield lost the opportunity to purchase the Aircraft and earn its substantial expected profits from the Aircraft's resale.

<u>COUNT I</u>

(Fraudulent Inducement)

82. Mansfield restates the allegations contained in the paragraphs above as if fully set forth herein.

83. As set forth more fully above, Defendants made false statements to Plaintiff that induced it to terminate its contract to purchase the Aircraft.

84. For example, and without limitation:

    a. On or about August 4th, Defendants caused a lien to be filed against the Aircraft in the FAA aircraft registry in Oklahoma City. The lien falsely stated that it was for non payment of services provided by Melk, and was meant only to deter other potential buyers of the Aircraft, including Mansfield.

    b. On or about August 14, 2014, Freestream represented that it had a valid contract to purchase the Aircraft even though Melk's contract was no longer valid due to his failure to make payment as required.

c. Both Melk and Freestream falsely promised that Mansfield would be paid, by Defendant Melk, if Mansfield agreed to terminate its contract to purchase the Aircraft, without the intention of fulfilling the promise.

d. Melk falsely stated that Mansfield would be paid an additional amount if Mansfield acted on Melk's behalf in closing the deal with PLL, without the intention of fulfilling the promise

85. These representations were material, knowingly made with the intention of inducing Mansfield's reliance, and Mansfield relied on the representations as more fully set forth herein.

86. Mansfield reasonably relied on Defendants' representations when terminating its contract for the purchase of the Aircraft and not pursuing the matter further.

87. The falsity of Defendants' statements was not open to Mansfield's knowledge at the time they were made.

88. As a result of its reliance on Defendants' intentional misrepresentations, Mansfield has suffered significant monetary damages, and is entitled to punitive damages, all to be determined at trial.

<u>COUNT II</u>

(Tortious Interference with Contract)

89. Mansfield restates the allegations contained in the paragraphs above as if fully set forth herein.

90. Mansfield had a valid and binding agreement with PLL for the purchase of the Aircraft.

91. Defendants knew that Mansfield had a contract with PLL to purchase the Aircraft and acknowledged as much when they contacted Mansfield's escrow agent on August 14, 2015.

92. Defendants took actions to intentionally interfere with Mansfield's contract, including but not limited to:

      a.  filing the fraudulent lien with the FAA;

      b.  misrepresenting to Mansfield that Melk also had a valid contract for the purchase of the Aircraft; and

      c.  falsely promising to pay Mansfield if it would relinquish its contractual right without an actual intention to do so.

93. Defendants took actions with the overall intention of disrupting, hindering, or preventing Mansfield and PLL from performing their respective obligations under the Mansfield Purchase Agreement.

94. Defendants' tortious interference caused Mansfield to terminate its contractual right to purchase the Aircraft.

95. Mansfield has suffered significant monetary damages as a result, and is entitled to punitive damages, all in an amount to be proven at trial.

COUNT III

(Tortious Interference With Prospective Business Relationship)

96. Mansfield restates the allegations contained in the paragraphs above as if fully set forth herein.

97. Mansfield expected to sell the Aircraft after it was purchased from Seller.

98. It had identified a buyer and negotiated the terms of the sale.

99.     Defendants knew that Mansfield intended to sell the Aircraft after the purchase from PLL.

100.     Defendants took actions to intentionally interfere with Mansfield's expectancy including, but not limited to, falsely stating that Melk also had a valid contract to purchase the Aircraft and falsely promising to pay Mansfield if it relinquished its contractual right to purchase the Aircraft.

101.     Defendants' actions required Mansfield to cancel its expected re-sale of the Aircraft.

102.     Mansfield has suffered significant monetary damages as a result, and is entitled to punitive damages, all in an amount to be proven at trial.

## COUNT IV

### (Civil Conspiracy)

103.     Mansfield restates the allegations contained in the paragraphs above as if fully set forth herein.

104.     Defendants were a member of a combination of two or more persons that embarked on a planned strategy to: (a) interfere with Mansfield's contractual expectation; and (b) fraudulently induce Mansfield to terminate its contract for the purchase of the Aircraft in order to purchase the Aircraft for their own benefit.

105.     The object of the conspiracy was to accomplish a legal purpose by unlawful means; namely, interfering with Mansfield's valid, binding contract, and inducing Mansfield to terminate the contract based on false representations, in order to purchase the Aircraft for Defendants' benefit.

106.     Defendants knew and understood what they were doing such that a meeting of the minds occurred.

107.     Defendants committed overt acts of fraud and tortious interference to further the conspiracy, including the affirmative fraudulent misrepresentations set forth above.

108.     As a result of Defendants' actions, Mansfield has suffered significant damages in an amount to be determined at trial.

<u>COUNT V</u>

(Promissory Estoppel)

109.     Mansfield restates the allegations contained in the paragraphs above as if fully set forth herein.

110.     Defendants made multiple promises to pay Mansfield if it would terminate its contract to purchase the Aircraft and withdraw its funds from escrow.

111.     Defendants' promises should reasonably have been expected to induce an action or forbearance of a definite and substantial character on the part of Mansfield.

112.     Mansfield justifiably, and to its detriment, relied on the promises made by the Defendants, and performed its obligations in terminating its contract and withdrawing its deposit from escrow, after which Defendants continued to make false promises concerning their intention to pay Mansfield if it would help facilitate the sale of the Aircraft to Melk.

113.     Mansfield sustained substantial damage and economic loss based on its reliance on the Defendants' promises, and is entitled to recover $200,000.00, the value of the promise, or other equitable compensation necessary to avoid injustice.

## COUNT VI

### (Unjust Enrichment)

114.    Mansfield restates the allegations contained in the paragraphs above as if fully set forth herein.

115.    Defendants were provided a measurable benefit by Mansfield when it agreed to terminate its contract to purchase the Aircraft, and withdraw its purchase funds from escrow.

116.    Mansfield held a reasonable expectation for payment by Defendants when it agreed to do so.  This expectation is embodied, without limitation, by the documents, communications, and conduct of Mansfield and the Defendants.

117.    The Defendants' enjoyment of the benefits it obtained by purchasing and reselling the Aircaft while refusing to provide payment to Mansfield is inequitable and unconscionable.

118.    As a result of Defendants' unjust enrichment, Mansfield is entitled to all remedies that equity, fairness and justice dictate, in an amount to be determined at trial.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Mansfield prays that this Court grant it the following relief:

1. That judgment enter for Mansfield on each of its claims;

2. Actual, compensatory, including special and consequential, damages;

3. Punitive and exemplary damages;

4. Fees, costs, and interest accrued; and

5. Such other relief as the Court may deem necessary, just, and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff Mansfield Heliflight, Inc., claims a trial by jury on all claims so triable.

Respectfully submitted,

Mansfield Heliflight, Inc.

By its attorney,

By: _____

Benjamin H. Klein
**GROSS & KLEIN LLP**
61 Broadway, Suite 2125
New York, NY 10006
Phone: (212) 658-1219
Fax:    (646) 626-6452
bklein@grosskleinlaw.com

Dated: February 1, 2016