U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2016 DEC -7  PM 4: 33

CLERK

BY_____
DEPUTY CLERK

MANSFIELD HELIFLIGHT, INC.,           )
                                      )
        Plaintiff,                    )
                                      )
    v.                                )        Case No. 2:16-cv-28
                                      )
FREESTREAM AIRCRAFT USA, LTD.         )
and RUDOLPH MELK, JR.,                )
                                      )
        Defendants.                   )

## OPINION AND ORDER DENYING DEFENDANT FREESTREAM AIRFCRAFT USA, LTD.'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2), 12(b)(3), AND 12(b)(6), AND DENYING AS MOOT PLAINTIFF'S MOTION FOR LEAVE TO AMEND
(Docs. 11 & 19)

Plaintiff Mansfield Heliflight, Inc. brings this action against Defendant Freestream Aircraft USA, Ltd. ("Defendant Freestream") and Defendant Rudolph Melk, Jr. (collectively, "Defendants") for fraudulent inducement (Count I), tortious interference with contract (Count II), tortious interference with a prospective business relationship (Count III), civil conspiracy (Count IV), promissory estoppel (Count V), and unjust enrichment (Count VI).[1]

Pending before the court is Defendant Freestream's motion to dismiss for lack of personal jurisdiction, improper venue, and failure to state a claim. (Doc. 11.) Plaintiff opposes the motion. In the event the court grants any part of Defendant Freestream's motion, Plaintiff requests leave to amend the Complaint. (Doc. 19.) After oral argument on August 9, 2016, the court took the pending motions under advisement.

---

[1] On July 7, 2016, following Plaintiff's application for entry of default, the Clerk of Court entered a default judgment as to Defendant Melk.

Plaintiff is represented by Benjamin H. Klein, Esq. Defendant Freestream is represented by Patrick J. Rohan, Esq., Jonathan R. Voegele, Esq., Richard B. Drubel, Esq., and Courtney R. Rockett, Esq.

## I.    The Complaint.

The following facts are derived from allegations in the Complaint. Plaintiff is a Vermont corporation with its principal place of business in Milton, Vermont. Defendant Freestream is a New Jersey corporation with its principal place of business in Teterboro, New Jersey. Defendant Melk is an individual who resides in Bantam, Connecticut. Plaintiff alleges that at all times described in the Complaint, Defendant Melk acted as Defendant Freestream's agent.

On or about July 21, 2015, "an entity affiliated with" Defendant Melk contracted to purchase a Gulfstream IV aircraft (the "Aircraft") from Punj Lloyd Limited ("PLL"), an aircraft seller in India. (Doc. 1 at 5-6, ¶ 26.) At the time, Plaintiff alleges that Defendant Melk "was acting as an agent for [Defendant] Freestream and/or [Defendant] Freestream's ultimate buyer," Blackjet, LLC ("Blackjet"), and intended to resell the Aircraft to Blackjet. *Id.* On the same day on which Defendant Melk entered into a contract with PLL, Defendants failed to deposit the purchase funds into escrow which terminated their contract to purchase the Aircraft.

On August 2, 2015, Plaintiff contracted with PLL for the purchase of the Aircraft, having previously deposited the full purchase price into escrow. At the time Plaintiff entered into its contract with PLL, Plaintiff intended to resell the Aircraft to another identified buyer for a profit.

On August 4, 2015, Defendants filed a lien against the Aircraft with the Federal Aviation Administration ("FAA"). The lien stated that PLL owed Defendant Melk in excess of $400,000 for nonpayment of services performed. However, neither Defendant Melk nor Defendant Freestream had performed any services associated with the Aircraft.

On August 14, 2015, Connie Marrero, Defendant Freestream's Executive Vice President, contacted Plaintiff's escrow agent to inform the agent that Defendant Freestream had a contract to purchase the aircraft from PLL, and that it had filed a lien

2

with the FAA in order to protect its interest in the Aircraft. The escrow agent subsequently communicated this information to Plaintiff.

On August 15, 2015, when Plaintiff contacted Defendant Freestream to inquire about the FAA lien, Defendant Freestream responded that it had a valid purchase agreement for the Aircraft predating Plaintiff's purchase agreement. Plaintiff then asked PLL for clarification regarding Defendant Freestream's lien and whether PLL had contracted with two buyers for the sale of the Aircraft. On August 17, 2015, PLL informed Plaintiff that although it had previously entered into a purchase agreement with Defendant Melk, that agreement was terminated by his failure to deliver the purchase price. PLL denied entering into a purchase agreement with Defendant Freestream. PLL further stated that the FAA lien "was premised on a blatant misrepresentation, as neither [Defendant] Melk nor [Defendant] Freestream had ever performed any services on the Aircraft." *Id.* at 7, ¶ 37.

In an August 19, 2015 communication with Plaintiff, Defendant Freestream indicated that it was not the purchaser of the Aircraft, but rather, was representing Defendant Melk in his purchase of it. Defendant Freestream stated that Defendant Melk's funds were in escrow, that he had conducted a "pre-buy inspection" of the Aircraft, and that he had initiated the process of obtaining "ferry permits" from the FAA to fly the Aircraft from India to the United States. *Id.* at 3, ¶ 9. Plaintiff responded that it had similarly invested time and expense to purchase the Aircraft, but that Defendant Freestream's lien clouded the Aircraft's title and precluded Plaintiff from obtaining financing and reselling it. Plaintiff stated that it would not relinquish its contractual rights to the Aircraft unless it was compensated.

On August 20, 2015, Defendant Freestream sent Plaintiff an agreement (the "Commission Agreement"), which provided that Defendant Melk, "through his alter ego" Lima Mike Bravo, LLC ("Lima Mike Bravo"), would pay Plaintiff $100,000 for terminating its contract with PLL and removing its purchase funds from escrow. *Id.* at 8, ¶ 44. Defendant Melk agreed to deliver the $100,000 payment upon completing his purchase of the Aircraft. On or about August 25, 2015, Plaintiff and Defendant Melk

executed the Commission Agreement. On that same date, Plaintiff's escrow agent informed PLL that Plaintiff was withdrawing its funds from escrow and terminating its contract to purchase the Aircraft. Defendants indicated that they expected to close on the Aircraft as early as that same day. However, that closing never occurred.

PLL's attorney stated to Plaintiff on August 26, 2015 that it was unwilling to sell the Aircraft to Defendant Melk "given Defendants' misrepresentations and unlawful conduct[.]" *Id.* at 9, ¶ 49. PLL's attorney allegedly stated that Defendant Melk, "by way of the Fraudulent FAA Lien, tried to extort PLL into selling him the Aircraft[,]" and that Defendant Melk was a broker who intended to sell the Aircraft to a third party immediately after the purchase. *Id.* at 9, ¶ 48. PLL's attorney further stated that "he was working on a deal whereby [Defendant] Melk would be returned his non-refundable deposit in exchange for his agreement to withdraw the [f]raudulent FAA [l]ien." *Id.* PLL intended to pursue a purchase agreement with Plaintiff once the lien was released. "As a result, Defendants decided to tarnish [Plaintiff's] credibility with PLL so that PLL would be willing to sell them the Aircraft." *Id.* at 9, ¶ 52.

On September 1, 2015, Defendants proposed to Plaintiff that it purchase the Aircraft and immediately sell it to Defendant Melk. Defendants offered to pay Plaintiff an additional $100,000, in addition to the original $100,000 promised, for a total of $200,000, to engage in this transaction. Plaintiff agreed to this proposal.

Plaintiff executed an agreement with Defendant Melk on September 11, 2015 that enabled Plaintiff to negotiate the purchase of the Aircraft on Defendant Melk's behalf. Plaintiff informed Defendant Melk that Defendants would need to deposit the purchase funds into escrow in order to purchase the Aircraft. Plaintiff thereafter negotiated a new deal with PLL to purchase the Aircraft.

Defendant Melk traveled to Milton, Vermont on September 25, 2015 in order to discuss the purchase of the Aircraft with Plaintiff. Defendant Melk explained that he was "still trying to get his buyers on board . . . but that he expected to have an agreement from all shortly." *Id.* at 10, ¶ 57. Plaintiff again explained that unless he imminently deposited

funds into escrow, the deal with PLL would disintegrate because PLL had begun to doubt Plaintiff's ability to fund the purchase and thereby close the deal.

Five days later, Defendant Melk sent Plaintiff a purchase agreement (the "Purchase and Sale Agreement") reflecting the anticipated sale of the Aircraft from Plaintiff to Defendant Melk. Defendant Melk used the "alter ego" SilverStar Aviation, LLC, registered to his home in Connecticut, as the purchaser in the Purchase and Sale Agreement. *Id.* at 10, ¶ 59. Defendant Melk agreed to "update the commission side letter to reflect" the name change and to reflect the obligation of SilverStar Aviation, LLC to pay Plaintiff upon completion of the sale. *Id.* at 11, ¶ 60. Plaintiff subsequently returned the Purchase and Sale Agreement to Defendant Melk with revisions.

During the two weeks that followed, Defendant Melk "stalled when pressed by [Plaintiff] about his delays, and was likewise noncommittal when asked about the availability of funds for the purchase of the Aircraft." *Id.* at 11, ¶ 62. For example, on October 7, 2015, Plaintiff inquired regarding when Defendant Melk would execute the Purchase and Sale Agreement, to which he responded that "it was with legal and that he was at their mercy." *Id.* at 11, ¶ 63. Plaintiff allegedly informed Defendant Melk on or about October 13, 2015 that unless he deposited funds into escrow, Plaintiff's transaction with PLL would fail. Defendant Melk did not respond to Plaintiff's communication, and Plaintiff never heard from him again.

Thereafter, Plaintiff contacted Ms. Marrero on October 16, 2015 to inquire whether Defendants intended to complete the purchase of the Aircraft. Ms. Marrero responded that she was out of the country and between flights, and could not respond at that time. On that same day, Defendant Freestream allegedly signed a contract to purchase the Aircraft directly from PLL.

Three days later, Plaintiff again contacted Ms. Marrero. Ms. Marrero responded "that the deal was in [Defendant] Melk's hands, and that [Defendant] Freestream was no longer involved in the purchase of the Aircraft." *Id.* at 12, ¶ 70. The next day, Plaintiff communicated with Ms. Marrero who allegedly maintained that Defendant Freestream

"had stepped aside so that [Plaintiff] and [Defendant] Melk could finalize the deal." *Id.* at 12, ¶ 71.

On October 28, 2015, Defendant Freestream completed its purchase of the Aircraft from PLL, and sold it to Blackjet, the buyer it had allegedly represented "all along[.]" *Id.* at 12, ¶ 73. Plaintiff alleges both Defendant Melk and Defendant Freestream earned commissions as a result of the sale to Blackjet.

When Plaintiff discovered Defendant Freestream's purchase of the Aircraft, Plaintiff contacted Defendant Freestream regarding the payment it had been promised in exchange for Plaintiff's relinquishment of the right to purchase the Aircraft. Ms. Marrero responded that Defendant Freestream did not owe Plaintiff any money because Plaintiff had made that agreement with Defendant Melk. Plaintiff repeatedly attempted to contact Defendant Melk by email and telephone to no avail.

## II.     Declarations Related to the Pending Motions to Dismiss for Lack of Personal Jurisdiction and for Improper Venue.

In analyzing the pending motions to dismiss for lack of personal jurisdiction and for improper venue, the court is not confined to the allegations in the Complaint and may also consider the parties' competing declarations. *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013) (holding that the court may "consider[] materials outside the pleadings . . . without converting a motion to dismiss for lack of personal jurisdiction into a motion for summary judgment"); *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005) (applying "the same standard of review in Rule 12(b)(3) dismissals for improper venue as we do in Rule 12(b)(2) dismissals for lack of personal jurisdiction" and observing that the court may "rely on pleadings and affidavits" in deciding a motion to dismiss for improper venue). Declarations submitted by the following individuals are therefore part of the record before the court: Eric D. Chase (Plaintiff's President); Tina Lindberg (Plaintiff's Chief Financial Officer and Director of Sales); Jonathan R. Voegele, Esq. (Defendant Freestream's counsel); and Ms. Marrero (Defendant Freestream's Executive Vice President).

6

## A.    Plaintiff's Declarations.

### 1.    Lindberg Declaration.

On August 14, 2015, Ms. Lindberg received the following email from Leda

Francis, President of Jetstream Escrow & Title Service, Inc. in Oklahoma City,

Oklahoma summarizing her telephone conversation with Ms. Marrero:

> I just received a call from Connie Marrero at Freestream Aircraft. They
> also have a signed contract with [PLL] for the purchase of [the Aircraft]!
> They have funded AIC Title Service and the deposit has been made non-
> refundable pending notification of deregistration from India. Having
> learned of the multiple escrows, Freestream Aircraft has filed a lien with
> FAA. Connie said you are free to call her if you would like to discuss.
> They are obviously as shocked and concerned as you. Her telephone
> number is [].

(Doc. 21-1 at 2.)

On August 15, 2015, Ms. Lindberg avers that she spoke with Ms. Marrero, who

"implied that it was Freestream that was purchasing the Aircraft and Freestream that had

filed the lien with the FAA." (Doc. 21 at 2, ¶ 4.) Ms. Lindberg states that Ms. Marrero

told her that Defendant Freestream's purchase agreement with PLL was "open and valid,

and that the lien was enforceable." *Id.*

Thereafter, Ms. Lindberg avers that Ms. Marrero called her "dozens" of times and

sent her "dozens" of text messages regarding the Aircraft. *Id.* at 2, ¶ 5. Ms. Lindberg

notes that Ms. Marrero made those contacts using a Vermont area code associated with

Ms. Lindberg's work and personal telephone and cell phone numbers. She additionally

represents that "[i]n one of [their] initial calls, Ms. Marrero expressed her surprise that a

helicopter company from Vermont was involved in the purchase of a business jet from

India." *Id.* Ms. Lindberg avers that during a telephone call on August 19, 2015, Ms.

Marrero informed her that Defendant Melk was the buyer of the Aircraft, "that

[Defendant] Freestream had been working with him since the beginning[,]" and that

Defendants' contract to purchase the Aircraft remained valid. *Id.* at 2, ¶ 6.

On August 20, 2015, Mr. Chase forwarded to Ms. Lindberg an email and the

attachment of a draft Commission Agreement, which he had received from Ms. Marrero.

7

Therein, Ms. Marrero states: "Please see attached for your review. Let me know if you have any questions and/or changes." (Doc. 21-2 at 2.) Ms. Lindberg subsequently reviewed the "document properties" of the Commission Agreement using Microsoft Word, which demonstrated that Ms. Marrero had authored it. (Doc. 21 at 3, ¶ 8.) Ms. Lindberg avers that she never spoke with Defendant Melk when negotiating the Commission Agreement, but rather negotiated solely with Ms. Marrero.

Ms. Lindberg responded to Ms. Marrero's email on August 24, 2015 as follows:

As per our conversation, we are in agreement that we are stepping out of our deal on the [Aircraft] for the fee of $100,000.00 to cover our expenses incurred. I have made the changes to the agreement sent by you last week, to reflect our current agreement. The memorialization of which is attached. Please have Mr. Melk sign and return to me this evening.

(Doc. 21-4 at 2.) She attached a revised copy of the Commission Agreement, which Ms. Marrero further revised and asked Ms. Lindberg to call her to discuss.

The following day, Ms. Marrero sent Ms. Lindberg a final version of the Commission Agreement between Plaintiff and Defendant Melk, which he had signed. The final Commission Agreement provides:

This letter confirms that upon signing below Lima Mike Bravo, LLC., has agreed to release to [Plaintiff] a fee of One Hundred Thousand United States Dollars ($100,000.00), to be paid at closing via wire transfer as per instructions listed below: in exchange, [Plaintiff] . . . has agreed not [to] pursue any further action in regards to the purchase of the [Aircraft], until such time as Lima Mike Bravo, LLC either closes and takes title to the aircraft, or for a period of 120 days from the date of this agreement, whichever comes first.

[Plaintiff], will take actions, as reasonably requested by Lima Mike Bravo, LLC, that may be required to effectuate and carry out the closing of Lima Mike Bravo's purchase of the [Aircraft] on August 25, 2015. Notwithstanding the foregoing, [Plaintiff] shall not be required to take any action that it deems unreasonable.

(Doc. 21-6 at 3.) The message includes Plaintiff's KeyBank bank account and routing number, located in Milton, Vermont. Between August 24-26, 2015, Ms. Lindberg states that Ms. Marrero sent her at least fourteen text messages regarding Defendants' request

8

that Plaintiff terminate its contract with PLL, and that between August 15-30, 2015, Ms. Marrero called her numerous times for that same purpose.

On August 25, 2015, Plaintiff's escrow agent terminated Plaintiff's purchase agreement with PLL.[2]  On that same day, Ms. Lindberg confirmed via email to Ms. Marrero that Plaintiff's purchase agreement with PLL had been terminated.

Ms. Lindberg avers that on August 26, 2015 she spoke with PLL's counsel, who explained that the FAA lien was invalid and would likely be rejected by the FAA.  PLL's counsel further explained that Defendants planned to file a disclaimer "since they now recognized the penalty they could be subject to for filing false statements with a federal agency." (Doc. 21 at 4, ¶ 17.) On September 3, 2015, a "Disclaimer and Release of Lien" was filed with the FAA, signed by Defendant Melk. (Doc. 21-10 at 2.)

When PLL subsequently refused to sell the Aircraft to Defendant Melk, Ms. Lindberg avers that Plaintiff agreed "to stand-in as the purchaser on his behalf, as long as he would front all the funds for the purchase." (Doc. 21 at 4, ¶ 19.) Her declaration includes a copy of the Purchase and Sale Agreement, dated as of October 4, 2015, that Plaintiff reached with Defendant Melk for that purpose. The Purchase and Sale Agreement, which is unsigned, reflects an agreement between Plaintiff and SilverStar Aviation, LLC.[3]  The Purchase and Sale Agreement contains the following choice-of-law provision:

> Applicable Law and Jurisdiction.  This Agreement, and any and all of the rights and obligations of the parties hereunder or in any way arising out of or relating hereto and any dispute in any manner relating to the foregoing shall be governed by, and construed, enforced and determined in accordance with, the laws of the State [o]f Vermont.

(Doc. 21-11 at 8, § 3.4.)

---

[2] Ms. Lindberg's declaration references and includes a copy of the August 3, 2015 Aircraft purchase agreement signed by Plaintiff and PLL.

[3] Because it is unsigned, it is unclear whether the Purchase and Sale Agreement became effective. *See* Doc. 21-11 at 8, § 3.6 ("This Agreement shall be effective only when signed by all parties.").

9

### 2.    Chase Declaration.

In his declaration, Mr. Chase avers that during an August 19, 2015 telephone call, Ms. Marrero informed him that Defendant Melk was the buyer of the Aircraft, and that he had invested more than $400,000 in preparation for that purchase. Mr. Chase further avers that, "[a]s an experienced purchaser of used aircraft, [he] did not find this claim to be credible." (Doc. 20 at 1, ¶ 2.) When he questioned the validity of the FAA lien, Ms. Marrero told him that FAA counsel and the attorneys for Defendants' escrow agent had confirmed its validity. Mr. Chase responded that because Plaintiff had invested money in pre-purchase arrangements and had anticipated a resale of the Aircraft, it would relinquish its right to purchase the Aircraft only if it received compensation. Ms. Marrero agreed to speak with Defendant Melk regarding a possible deal with Plaintiff. On August 20, 2015, Mr. Chase received a draft Commission Agreement requiring Defendant Melk to pay Plaintiff in exchange for Plaintiff's agreement to terminate its contract with PLL.

On September 10, 2015, Mr. Chase states that he received an email from Ms. Marrero, explaining that Defendant Melk wanted to talk to Mr. Chase directly. On September 25, 2015, Defendant Melk traveled to Plaintiff's facility in Milton, Vermont to discuss the transaction whereby Plaintiff would purchase the Aircraft from PLL and immediately resell it to Defendant Melk.

### B.    Defendant Freestream's Declarations.

#### 1.    Voegele Declaration.

The Voegele Declaration includes a copy of the FAA lien on the Aircraft. The lien is signed by Defendant Melk and provides that Lima Mike Bravo, LLC claims a lien on the Aircraft "for NON payment of services rendered" in the amount of $404,355.00. (Doc. 13-1 at 2.) It states that the services were rendered in connection with the July 21, 2015 purchase agreement with PLL.

#### 2.    Marrero Declaration.

In her declaration, Ms. Marrero explains that Defendant Freestream provides aircraft brokerage, acquisition, marketing, sales, and custom design services. She avers that Defendant Freestream does not have any employees, agents, or offices in Vermont,

owns no property and has no assets, investment, security interests or banking or other accounts in Vermont and "does not and never has derived substantial revenue from any services rendered in Vermont." (Doc. 12 at 2, ¶ 8.) She further avers that Defendant Freestream has never conducted transactions within Vermont or with a Vermont resident, including Plaintiff.

Ms. Marrero asserts that Defendant Freestream did not negotiate or execute any of the contracts at issue in Vermont, and that all of the witnesses and evidence relating to Defendant Freestream's alleged involvement in this case are located in New Jersey. Ms. Marrero avers that Defendant Freestream was not aware that Plaintiff was a Vermont corporation with its principal place of business in Vermont until the instant lawsuit was filed. In addition, she claims that Defendant Freestream did not knowingly send or direct any telephonic or written communications related to this case to Vermont.

Ms. Marrero explains that Defendant Freestream and Defendant Melk "never had any agency relationship, implied or otherwise, in connection with the transaction that is the subject matter of this litigation" and that Defendant Freestream "never asked [Defendant] Melk to act on its behalf." *Id.* at 3, ¶ 15. She further states that Defendant Freestream had no involvement in "negotiating, drafting, or signing any agreement between [Plaintiff] and [Defendant Melk] or Lima Mike Bravo, LLC regarding payment of $100,000 (or allegedly $200,000 at a later time) allegedly made in exchange for [Plaintiff's] termination of its purchase agreement." *Id.* at 3, ¶ 14. She avers that Defendant Freestream "had knowledge of [the Commission Agreement] only insofar as [she] was copied unwillingly on emails between [Plaintiff's] employees and [Defendant] Melk on or about August 20, 2015 to August 25, 2015." *Id.* Ms. Marrero also avers that neither she nor Defendant Freestream "caused a lien to be filed" on the Aircraft. *Id.* at 2, ¶ 13. Indeed, she states, Defendant Freestream "did not even know that such a lien was going to be filed and learned of the lien only after it had been filed." *Id.*

11

III.    **Conclusions of Law and Analysis.**

    A.    **Whether to Grant Defendant Freestream's Motion to Dismiss for Lack of Personal Jurisdiction.**

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). "In evaluating whether the requisite showing has been made, [the court] construe[s] the pleadings and any supporting materials in the light most favorable to the plaintiff[]." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013).

"In diversity or federal question cases the court must look first to the long-arm statute of the forum state" to determine whether it authorizes jurisdiction over the defendant in the forum. *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997). "[T]he second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010).

    Vermont's long-arm statute, 12 V.S.A. § 913(b), provides:

> Upon the service [on a party outside of Vermont], and if it appears that the contact with the state by the party or the activity in the state by the party or the contact or activity imputable to him is sufficient to support a personal judgment against him, the same proceedings may be had for a personal judgment against him as if the process or pleading had been served on him in the state.

The Vermont Supreme Court has construed Vermont's long-arm statute as permitting the exercise of personal jurisdiction to the "full extent permitted by the Due Process Clause" of the United States Constitution. *N. Aircraft, Inc. v. Reed*, 572 A.2d 1382, 1385 (Vt. 1990). Accordingly, the court need only examine "whether the exercise of [personal] jurisdiction comports with federal due process. To do so, [it] undertake[s] an analysis consisting of two components: the 'minimum contacts' test and the 'reasonableness' inquiry." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002); *see also N. Aircraft*, 572 A.2d at 1386 (citation and internal quotation marks omitted) (providing that "once the court determines that a nonresident

defendant has purposefully established minimum contacts within the forum State, several factors must be considered to ensure that exercising personal jurisdiction over the defendant is reasonable").

"To determine whether a defendant has the necessary 'minimum contacts,' a distinction is made between 'specific' and 'general' personal jurisdiction." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). Specific jurisdiction "exists when a [forum] exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum[.]" *Id.* at 673-74 (alteration in original) (internal quotation marks omitted). In contrast, general jurisdiction "is based on the defendant's general business contacts with the forum . . . and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *Id.* at 674 (alteration in original) (internal quotation marks omitted). In this case, there is no factual basis for general jurisdiction, and Plaintiff concedes that it requests the court to exercise only specific jurisdiction.

### 1.   Whether Specific Jurisdiction Exists.

This court may exercise personal jurisdiction if Defendant Freestream has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws[,] . . . [which] ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts[.]" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotation marks omitted). "For the purpose of establishing specific personal jurisdiction, the necessary fair warning requirement" that the defendant could reasonably anticipate being sued in the forum state "is satisfied if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *In re Terrorist Attacks*, 714 F.3d at 674 (internal quotation marks omitted).

In determining whether the court has jurisdiction over an out-of-state defendant consistent with the Due Process Clause, the court "must evaluate the 'quality and nature[]' . . . of the defendant's contacts with the forum state under a totality of the

13

circumstances test[.]" *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (quoting *Burger King*, 471 U.S. at 475). "These same principles apply when intentional torts are involved." *Walden v. Fiore*, 134 S. Ct. 1115, 1123 (2014).

Plaintiff argues that Defendant Freestream has "minimum contacts" with Vermont because it initiated and engaged in ongoing communications with Plaintiff, drafted and negotiated the Commission Agreement, and conspired with Defendant Freestream's alleged agent Defendant Melk, thereby making Defendant Melk's contacts with Vermont attributable to Defendant Freestream. Defendant Freestream responds that its contacts with Vermont were unwitting and insufficient, and that there is no factual or legal basis for attributing Defendant Melk's contacts to it.

Plaintiff points to a number of ways in which Defendants reached out to Plaintiff in Vermont and created contacts there. Defendant Freestream first contacted Plaintiff's escrow agent and offered to discuss the FAA lien. Thereafter, Defendant Freestream contacted Plaintiff on numerous occasions through telephone calls and text messages to Ms. Lindberg's Vermont personal and work telephone and cell phone numbers. *See Burger King*, 471 U.S. at 481 (holding that personal jurisdiction existed and noting that the defendant "carried on a continuous course of direct communications by mail and by telephone"). In one of these conversations, according to the Lindberg Declaration, Ms. Marrero "expressed her surprise" that a Vermont company was involved in the purchase of a business jet from India. (Doc. 21 at 2, ¶ 5); *see RLB & Assocs., Ltd. v. Aspen Med. Pty.*, 2016 WL 344925, at *5 (D. Vt. Jan. 27, 2016) (observing that awareness of plaintiff's status as a Vermont corporation is "a factor to be considered" in the court's analysis). These facts support a conclusion that Defendant Freestream knowingly and voluntarily initiated contact with a Vermont company and that Plaintiff's claims arise out of at least some of those contacts.[4]

---

[4] *Cf. RLB & Assocs., Ltd. v. Aspen Med. Pty.*, 2016 WL 344925, at *5 (D. Vt. Jan. 27, 2016) (concluding that the court lacked personal jurisdiction over the defendants and observing that "they did not 'reach out' to [p]laintiff, but instead were solicited by [p]laintiff to enter into a business relationship").

Plaintiff's claim that Defendant Melk's contacts with Vermont may be imputed to Defendant Freestream solely on an agency or conspiracy theory presents a closer question. Plaintiff alleges that Defendant Melk at all times acted as Defendant Freestream's agent.

"Generally, the actions of an agent may be imputed to the principal for purposes of personal jurisdiction if (1) the agent acted within the scope of actual or apparent authority bestowed by the principal; or (2) the principal ratified the agent's actions after the fact." *Lakeside Equip. Corp. v. Town of Chester*, 795 A.2d 1174, 1180 (Vt. 2002) (citing *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1073 (9th Cir. 2001)). Apparent authority "derives from conduct of the principal, communicated or manifested to the third party, which reasonably leads the third party to rely on the agent's authority." *New England Educ. Training Serv., Inc. v. Silver St. P'ship*, 528 A.2d 1117, 1120 (Vt. 1987).

Plaintiff's declarations indicate that at times, Ms. Marrero, an officer and employee of Defendant Freestream, acted at the apparent direction of Defendant Melk and on both his and Defendant Freestream's behalf. There is no evidence before the court, however, regarding the scope of Defendant Melk's actual authority, only limited evidence of Defendant Melk's apparent authority, and virtually no evidence that Defendant Freestream and Defendant Melk ratified each other's acts. At this nascent stage of the proceedings, Plaintiff has not sustained its burden to establish personal jurisdiction on the basis of an agency relationship.

Correspondingly, the "conspiracy theory of jurisdiction" does not confer personal jurisdiction over a non-resident co-conspirator based merely on allegations that a conspiracy existed. *See Vt. Castings, Inc. v. Evans Prods. Co., Grossman's Div.*, 510 F. Supp. 940, 944 (D. Vt. 1981) ("[M]ere allegations of conspiracy, even coupled with the presence of one conspirator within the jurisdiction, do not give jurisdiction over all nonresident co-conspirators."). Rather, it must be alleged that "substantial acts in furtherance of the conspiracy were performed in the forum state" and that the nonresident

15

co-conspirator "must know, or have good reason to know, that his conduct will have effects in the (forum) state." *Id.* (internal quotation marks omitted).[5]

At the pleadings stage, Plaintiff alleges sufficient evidence of an agreement to jointly undertake activities contrary to Plaintiff's interests to render Defendant Melk's contacts with Vermont plausibly attributable to Defendant Freestream. *See, e.g.*, *Vt. Castings*, 510 F. Supp. at 944-45 (concluding that nonresident defendant employee's acts in Vermont could be imputed to the nonresident defendant and denying motion to dismiss for lack of personal jurisdiction). Although Defendant Freestream disclaims any activity on Defendant Melk's behalf, the evidence before the court is to the contrary and includes Defendant Freestream's employee and Executive Vice President, Ms. Marrero, drafting and negotiating the Commission Agreement on Defendant Melk's behalf with Plaintiff.

Defendant Melk also allegedly committed tortious acts in furtherance of the conspiracy in Vermont, including travelling to Plaintiff's facilities in Vermont to negotiate the Purchase and Sale Agreement. *See Chloé*, 616 F.3d at 171-72 (holding that defendant's acts, including those by a co-defendant which were imputed to defendant, justified the exercise of specific jurisdiction because his allegedly tortious acts were purposely directed at the forum state).

The choice-of-law provision in the unsigned Purchase and Sale Agreement provides some evidence that Defendants were on notice that Plaintiff believed their business relationship would be governed by Vermont law. *See Burger King*, 471 U.S. at 482 ("Although [a choice-of-law] provision standing alone would be insufficient to confer jurisdiction, . . . it reinforce[s] [defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there."). It is, moreover,

---

[5] *See also Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1070 (10th Cir. 2007) ("[A] co-conspirator's presence within the forum might reasonably create the 'minimum contacts' with the forum necessary to exercise jurisdiction over another co-conspirator if the conspiracy is directed towards the forum, or substantial steps in furtherance of the conspiracy are taken in the forum[.]"); *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 782 F. Supp. 215, 221 (S.D.N.Y. 1992) ("[A] plaintiff must: (1) make a *prima facie* factual showing of a conspiracy; (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy; and (3) show that the defendant's co-conspirator committed a tortious act pursuant to the conspiracy in this jurisdiction.").

16

undisputed that each contact Defendants had with Vermont was solely in furtherance of the allegedly tortious activities and breaches of contract that form the basis of Plaintiff's claims.

When Defendant Melk's contacts with Vermont are imputed to Defendant Freestream, those contacts, together with Defendant Freestream's own contacts with Vermont, are sufficient to establish "minimum contacts" that justify the court's exercise of personal jurisdiction over Defendant Freestream on the basis of specific jurisdiction.

### 2.    Application of the "Fairness Factors."

Having concluded that "minimum contacts" exist, the court turns to whether the exercise of personal jurisdiction over Defendant Freestream comports with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). In making this determination, the court evaluates: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477 (internal quotation marks omitted).

"The import of the 'reasonableness' inquiry varies inversely with the strength of the 'minimum contacts' showing—a strong (or weak) showing by the plaintiff on 'minimum contacts' reduces (or increases) the weight given to 'reasonableness.'" *Bank Brussels Lambert*, 305 F.3d at 129. In this case, because Plaintiff has not made a compelling demonstration of "minimum contacts," the court examines the "fairness factors" with greater scrutiny.

In evaluating whether the exercise of personal jurisdiction will result in the efficient administration of justice, the court "generally consider[s] where witnesses and evidence are likely to be located." *Metro. Life Ins.*, 84 F.3d at 574. Plaintiff asserts that significant evidence is located in Vermont, including Mr. Chase and Ms. Lindberg, who both allegedly have significant knowledge of the facts giving rise to Plaintiff's claims.

17

Ms. Marrero appears to be located in New Jersey, Defendant Melk is located in
Connecticut, and a small number of third-party witnesses may be located in Florida or
Oklahoma. It thus appears that there is not a single forum in which a substantial majority
of witnesses are located. *See Irving v. Revera, Inc.*, 2011 WL 5329726, at *5 (D. Vt.
Nov. 4, 2011) (holding that where likely witnesses reside and discovery will likely be
taken outside the forum state, "this factor does not point decisively in favor of the
reasonableness or unreasonableness of exercising personal jurisdiction"). Defendant
Freestream nonetheless claims that its witnesses are located in New Jersey[6] and that
Plaintiff has retained New York City-based counsel in this lawsuit. It therefore argues
that "a forum more proximate to the witnesses and evidence" would be more convenient.
(Doc. 11 at 18.)

Although there is no optimal forum, Vermont appears to be the forum with the
most extensive contacts with the witnesses and the evidence in this case. The burden
Defendant Freestream faces in litigating in Vermont is minimal. *See Bank Brussels
Lambert*, 305 F.3d at 129-30 (internal quotation marks omitted) ("[T]he conveniences of
modern communication and transportation ease what would have been a serious burden
only a few decades ago."). As a result, this fairness factor weighs slightly in favor of an
exercise of jurisdiction.

Vermont also has an interest in protecting its residents' business interests and in
redressing their tortious and contractual injuries. No other forum is likely to have an
equivalent interest in this dispute. *See Burger King*, 471 U.S. at 473 ("A State generally
has a 'manifest interest' in providing its residents with a convenient forum for redressing
injuries inflicted by out-of-state actors."); *see also KBA N. Am. Inc. v. Amerigraph, LLC*,
2007 WL 4119119, at *3 (D. Vt. Nov. 16, 2007) (noting that "Vermont has a clear
interest in protecting the business interests of its residents").

There is no evidence that Defendant Freestream will suffer prejudice if it is forced
to litigate in a Vermont federal court. There is likewise no indication that Plaintiff would

---

[6] Other than Ms. Marrero and Defendant Melk, Defendant Freestream has not identified by name
any other witnesses located outside Vermont.

face any prejudice if the dispute were litigated in another forum. However, Plaintiff does have an interest in consolidating its claims against Defendants in a single forum and litigating its claims in its chosen forum. *See, e.g.*, *Irving*, 2011 WL 5329726, at *4 (noting that plaintiffs have "an interest in pursuing their eleven-count complaint against all defendants . . . even if it would not impact the size of a potential judgment"). Plaintiff has already obtained a default judgment against Defendant Melk, and exercising jurisdiction over Defendant Freestream would avoid the need to file a separate suit against that defendant in another forum. Plaintiff may also claim a reasonable expectation that its claims will be governed by Vermont law as contemplated by the unsigned Purchase and Sale Agreement. Defendant Freestream identifies no contrary expectation that this dispute would be governed by the laws of New Jersey or any other forum. This factor thus also weighs in favor of a Vermont forum.

Finally, the court must "consider the common interests of the several states in promoting substantive social policies." *Metro. Life Ins.*, 84 F.3d at 575. Neither Plaintiff nor Defendant Freestream has identified any substantive social policies that are implicated by this case, and correspondingly, this factor does not weigh in either party's favor. *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 245 (2d Cir. 1999) (noting that the parties did "not suggest[] or show[] that any substantive social policies would be furthered or undermined by permitting the case against [defendant] to go forward in New York").

On balance, the fairness factors weigh in favor of the court's exercise of personal jurisdiction over Defendant Freestream in Vermont. It is therefore consistent with the Due Process Clause of the United States Constitution for this court to exercise specific jurisdiction. *See Chloé*, 616 F.3d at 173 (citation omitted) (finding the first three factors favor jurisdiction and the last two factors are neutral, and holding that "asserting jurisdiction over [defendant] comports with 'traditional notions of fair play and substantial justice,' . . . such that it satisfies the reasonableness inquiry of the Due Process Clause").

For the foregoing reasons, Defendant Freestream's motion to dismiss under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction is DENIED. Plaintiff's alternative request for jurisdictional discovery is DENIED AS MOOT.

## B.   Whether to Grant Defendant Freestream's Motion to Dismiss for Improper Venue.

In resolving a motion to dismiss for improper venue, the court accepts the facts alleged in the Complaint as true and views them in the light most favorable to Plaintiff. *See Gulf Ins. Co.*, 417 F.3d at 355; *see also Jenkins v. Miller*, 983 F. Supp. 2d 423, 464 (D. Vt. 2013) (holding that at motion to dismiss stage, a plaintiff "need only make a prima facie showing of venue"). "The concepts of personal jurisdiction and venue are closely related but nonetheless distinct." *United States ex rel. Rudick v. Laird*, 412 F.2d 16, 20 (2d Cir. 1969).

28 U.S.C. § 1391(b) governs venue in diversity cases, and states that venue is appropriate in:

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

Plaintiff claims that venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because Defendant Freestream directed its conduct towards Plaintiff in Vermont, including "voluminous misrepresentations giving rise to [Plaintiff's] claims[,]" and thus a substantial part of the relevant events took place in Vermont. (Doc. 19 at 25.)

"[W]hen a plaintiff relies on § 1391(b)(2) to defeat a venue challenge, a two-part inquiry is appropriate." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005):

First, a court should identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims. Second, the court should determine whether a substantial part of those acts or omissions

20

occurred in the district where suit was filed, that is, whether significant events or omissions material to those claims have occurred in the district in question.

*Id.* (alterations, citation, and internal quotation marks omitted). A plaintiff "need not demonstrate that [its] choice of venue is the best forum; [it] need only demonstrate a *prima facie* case that [its] choice is permissible under the [venue] statute." *Jenkins*, 983 F. Supp. 2d at 464.

Although venue may be proper "in multiple judicial districts as long as 'a substantial part' of the underlying events took place in those districts, . . . [the Second Circuit] caution[s] district courts to take seriously the adjective 'substantial[]' . . . [and] to construe the venue statute strictly." *Gulf Ins. Co.*, 417 F.3d at 356-57. As a result, "[w]hen material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed 'significant' and, thus, substantial, but when a close nexus is lacking, so too is the substantiality necessary to support venue." *Daniel*, 428 F.3d at 433.

Courts within the Second Circuit have considered a variety of factors in conducting a venue analysis pursuant to 28 U.S.C. § 1391, including where the plaintiff allegedly received communications from the defendant regarding the subject matter at issue in the lawsuit,[7] where the plaintiff allegedly sustained injuries,[8] and where a pertinent contract was allegedly negotiated and entered into by the plaintiff.[9]

In this case, Plaintiff alleges that Defendant Freestream drafted, forwarded, and negotiated the Commission Agreement with Plaintiff in Vermont, and provided for

---

[7] *See, e.g.*, *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 154 (2d Cir. 2001) ("[M]any of [defendant's] communications reached [plaintiff's] offices in New York[.] . . . Accordingly, venue in the Southern District of New York was proper.").

[8] *See, e.g.*, *Rothstein v. Carriere*, 41 F. Supp. 2d 381, 387 (E.D.N.Y. 1999) ("'The place where the harm occurred is . . . relevant for venue purposes.'"); *see also Reynolds Corp. v. Nat'l Operator Servs., Inc.*, 73 F. Supp. 2d 299, 306 (W.D.N.Y. 1999) ("The Court is also convinced that venue is proper for [the plaintiff's] tort claims. Although the tortious conduct arguably occurred in Maryland, plaintiff's injuries, albeit economic in nature, occurred in this district.").

[9] *See, e.g.*, *KBA N. Am. Inc. v. Amerigraph, LLC*, 2007 WL 4119119, at *3 (D. Vt. Nov. 16, 2007) (holding that venue in breach of contract action was proper in the District of Vermont in part because "the underlying agreements were at least in part negotiated, prepared, and entered into by [plaintiff] in Vermont").

payment thereunder to Plaintiff's KeyBank account in Milton, Vermont. Plaintiff further alleges it sustained its injuries in Vermont where it conducts business. The Commission Agreement is central to Plaintiff's claims in this matter. *See KBA N. Am.*, 2007 WL 4119119, at *3 (holding venue in the District of Vermont is proper, and noting the significance of failure to remit payment to plaintiff in Vermont in venue analysis); *see also Saltzman v. La. Auction Exch., Inc.*, 997 F. Supp. 537, 541 (S.D.N.Y. 1998) (finding venue proper in New York in part because "[p]laintiff's counsel negotiated with defendants from New York City, and payment under the terms of the letter agreement was due to plaintiff in New York"). Because a "substantial part" of the events or omissions giving rise to Plaintiff's claims occurred in Vermont, venue in the District of Vermont is proper. Defendant Freestream's motion to dismiss for improper venue pursuant to Fed. R. Civ. P. 12(b)(3) is therefore DENIED.

### C. Whether to Grant Defendant Freestream's Motion to Dismiss for Failure to State a Claim.

In the event the court exercises personal jurisdiction over it, pursuant to Fed. R. Civ. P. 12(b)(6), Defendant Freestream asks the court to dismiss Plaintiff's Complaint for failure to state a plausible claim for relief. "[A] pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (internal quotation marks omitted). The "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (internal quotation marks omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### 1.    Whether Plaintiff Alleges a Plausible Claim of Fraudulent Inducement (Count I).

In Count I, Plaintiff asserts a claim for fraudulent inducement, alleging that Defendant Freestream made several misrepresentations in order to induce Plaintiff to abandon its contract to purchase the Aircraft from PLL.  Defendant Freestream responds that Plaintiff has not plausibly pled fraudulent inducement, has failed to plead fraud with particularity, and has alleged an injury that is barred by the economic loss rule.

Under Vermont law, a party alleging fraudulent inducement must plead facts alleging "an intentional misrepresentation of fact affecting the essence of the transaction, false when made and known to be false by the maker, not open to the defrauded party's knowledge, and relied upon by the defrauded party to its damage." *Citibank N.A. v. City of Burlington*, 971 F. Supp. 2d 414, 430 (D. Vt. 2013) (internal quotation marks omitted).[10]  The plaintiff must also "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) requires that the pleading "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

Plaintiff has pled fraudulent inducement with sufficient particularity.  It identifies at least three allegedly false statements that Defendant Freestream made or caused to be made: (1) the August 4, 2015 lien filed against the Aircraft in the FAA aircraft registry, falsely premised upon non-payment of services provided by Defendant Melk; (2) the August 14, 2015 representation to Plaintiff's escrow agent that Defendant Freestream had a valid contract to purchase the Aircraft; and (3) the August 20, 2015 representation that Defendant Melk would pay Plaintiff to relinquish its claim to the Aircraft.  Plaintiff's Complaint further alleges that Ms. Marrero made a false representation on August 14, 2015 to Plaintiff's escrow agent that a valid FAA lien existed on the Aircraft.  Plaintiff's

---

[10] For purposes of the pending motion, the parties assume that Vermont law applies to Plaintiff's claims.  Without deciding the issue, the court proceeds on that assumption as well.

Complaint adequately explains how each of the alleged statements was fraudulent and how it relied on those statements to its detriment. Although Defendant Freestream points out that Plaintiff had equal access to the alleged true facts through its communications with PLL, it cites no authority for the proposition that Plaintiff was compelled to accept PLL's version of the events. At best, Defendant Freestream has identified a credibility determination that must be made by the finder of fact.

In the alternative, Defendant Freestream relies on the economic loss rule that "claimants cannot seek, through tort law, to alleviate losses incurred pursuant to a contract," and seeks dismissal of Plaintiff's fraudulent inducement claim on this basis. *Springfield Hydroelectric Co. v. Copp*, 779 A.2d 67, 70 (Vt. 2001). In support of this argument, Defendant Freestream cites *EBWS, LLC v. Britly Corp.*, 2007 VT 37, ¶ 30, 181 Vt. 513, 524, 928 A.2d 497, 507, a case invoking the economic rule to bar recovery for negligence claims. Whether the economic loss rule bars recovery for fraud-based claims is not settled in Vermont.[11] At the pleading stage, dismissal of a novel claim without the benefit of discovery and a factual record is not warranted. *See Adato v. Kagan*, 599 F.2d 1111, 1117 (2d Cir. 1979) ("Tenuous theories of liability are better assayed in the light of actual facts than in pleader's supposition."). Defendant Freestream's motion to dismiss Plaintiff's fraudulent inducement claim (Count I) for failure to state a claim is therefore DENIED.

## 2.   Whether Plaintiff Alleges a Plausible Claim of Tortious Interference with Contract (Count II).

In Count II, Plaintiff alleges that Defendant Freestream tortiously interfered with Plaintiff's contract with PLL by filing a false FAA lien which prevented the consummation of Plaintiff's purchase of the Aircraft. Defendant Freestream seeks dismissal of this claim because Plaintiff unilaterally terminated the Commission

---

[11] This court has previously declined to invoke the economic loss rule to dismiss fraud-based claims under Vermont law. *See, e.g., Sherman v. Ben & Jerry's Franchising, Inc.*, 2009 WL 2462539, at *4 (D. Vt. Aug. 10, 2009) (denying motion to dismiss fraud in the inducement claims based on economic loss rule); *see also Mount Snow Ltd. v. ALLI*, 2012 WL 1957560, at *4 (D. Vt. May 30, 2012) (denying motion to dismiss constructive fraud claim based on economic loss rule).

Agreement and therefore should not be permitted to claim Defendant Freestream
tortiously interfered with that contract.

To state a claim for tortious interference with contract, a plaintiff must allege that
the defendant intentionally and improperly caused a third party's non-performance of its
contract with the plaintiff. *See Gifford v. Sun Data, Inc.*, 686 A.2d 472, 473 (Vt. 1996)
(holding that plaintiff must show that defendant "intentionally and improperly induced [a
third party] not to perform its contract"). The act of interference must be "wrongful or
improper by some measure beyond the fact of interference itself" in order to support
liability. *Kollar v. Martin*, 706 A.2d 945, 946 (Vt. 1997) (citation omitted).

Plaintiff concedes that it terminated the Commission Agreement, but alleges that it
was Defendants that caused this to occur. Plaintiff points out that PLL was prepared to
sell the Aircraft to Plaintiff but that Plaintiff's "financiers would not agree to fund the
purchase of the Aircraft as long as there was a $400,000 lien against it" and that "the
buyer that [Plaintiff] had identified to purchase the Aircraft also would have backed out
of the deal as a result of the Fraudulent FAA Lien." (Doc. 1 at 7, ¶ 39.) Viewing these
allegations in the light most favorable to Plaintiff and drawing all reasonable inferences
in its favor, Plaintiff has adequately alleged that PLL or other third-party financiers, or
both, would have terminated the sale of the Aircraft solely because Defendants had
allegedly improperly filed a fraudulent FAA lien against the Aircraft's title. Plaintiff thus
adequately alleges a causal relationship between Defendants' alleged tortious conduct
and an injury to Plaintiff's identified contractual relationships. Count II therefore
plausibly states a claim for tortious interference with contract, and Defendant
Freestream's motion to dismiss this claim is DENIED.

### 3. Whether Plaintiff Alleges a Plausible Claim of Tortious Interference with a Prospective Business Relationship (Count III).

Based on the same nucleus of facts that underpin its claim in Count II, in Count
III, Plaintiff asserts a claim for tortious interference with a prospective business

relationship. Defendant Freestream argues that this claim must be dismissed because it lacks sufficient factual content to state a plausible claim for relief.

To state a claim for tortious interference with a prospective business relationship, a plaintiff must allege:

> (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional act of interference on the part of the interferer; (4) damage to the party whose relationship or expectancy was disrupted; and (5) proof that the interference caused the harm sustained.

*J.A. Morrissey, Inc. v. Smejkal*, 2010 VT 66, ¶ 21, 188 Vt. 245, 255, 6 A.3d 701, 708-09 (citing *Gifford*, 686 A.2d at 474 n.2). The tort "protects the same interest in stable economic relationships as does the tort of interference with contract, but applies to business relationships not formally reduced to contract." *Gifford*, 686 A.2d at 474. "Competitive business practices[,]" however, do not give rise to this tort, and if a defendant's interference is "intended to advance its own competing interests, the claim will fail unless the defendant's methods are criminal or fraudulent." *Id.* at 475.

Plaintiff alleges that it had a prospective business relationship with an "identified" third-party buyer to whom it expected to resell the Aircraft after purchasing it from PLL and that "Defendants knew that [Plaintiff] intended to sell the Aircraft after the purchase from PLL." (Doc. 1 at 7, 16, ¶¶ 39, 99.) In addition, Plaintiff alleges that Defendants engaged in certain fraudulent and unlawful activity, such as filing a false FAA lien which, if established, could be considered beyond mere "competitive business practices[.]" *Cf. Gifford*, 686 A.2d at 474 ("Competitive business practices are not tortious."). Plaintiff has also alleged it has suffered damages due to the loss of an expected resale profit, which allegedly resulted directly from Defendants' improper acts of interference.

Accepting Plaintiff's factual allegations as true, the Complaint's allegations adequately and plausibly allege that Defendant Freestream tortiously interfered with a prospective business relationship of Plaintiff's. Defendant Freestream's motion to dismiss Count III for failure to state a claim is therefore DENIED.

### 4.   Whether Plaintiff Alleges a Plausible Claim of Civil Conspiracy (Count IV).

Count IV asserts a claim against Defendants for civil conspiracy. Defendant
Freestream argues that there is no independent cause of action for civil conspiracy under
Vermont law, and that, in any event, Plaintiff's allegations do not support a plausible
claim for relief. Vermont law defines a *criminal* conspiracy as "a combination of two or
more persons to effect an illegal purpose, either by legal or illegal means, or to effect a
legal purpose by illegal means[;]" in civil cases, the plaintiff "must be damaged by
something done in furtherance of the agreement, and the thing done [must] be something
unlawful in itself[.]" *Akerley v. N. Country Stone, Inc.*, 620 F. Supp. 2d 591, 600 (D. Vt.
2009) (internal quotation marks omitted) (quoting *Boutwell v. Marr*, 42 A. 607, 609 (Vt.
1899)). The Vermont Supreme Court, however, in a non-precedential order issued by a
three-judge panel, has questioned the continued vitality of a common law cause of action
for civil conspiracy. *See Davis v. Vile*, 2003 WL 25746021, at *3 (Vt. Mar. 2003)
(unpub. mem.) ("[a]ssuming that there continues to be an independent cause of action for
the tort of civil conspiracy" and dismissing the claim for failure to allege facts satisfying
the elements of civil conspiracy).[12]

Where applicable state substantive law is unclear, a federal court sitting in
diversity must predict how the state's highest court would decide the case. *See Giuffre
Hyundai, Ltd. v. Hyundai Motor Am.*, 756 F.3d 204, 209 (2d Cir. 2014) (internal
quotation marks omitted) ("[I]t is our job to predict how the forum state's highest court
would decide the issues before us[.]"). At this juncture, the court predicts that in certain
circumstances, a civil conspiracy claim may be recognized under Vermont law.

Assuming that a claim of civil conspiracy will be recognized, Plaintiff has alleged
facts that support a plausible inference of a conspiracy between Defendants. It has

---

[12] *See also Saunders v. Morton*, 2011 WL 1135132, at *9-10 (D. Vt. Feb. 17, 2011) (noting that
"[i]t is not entirely clear under Vermont law whether the tort of civil conspiracy constitutes an
independent cause of action" but that "this Court has issued decisions upon parties' claims of
civil conspiracy in which it has been assumed that the claim constitutes an independent cause of
action in Vermont."), *report and recommendation adopted by* 2011 WL 1114416 (D. Vt. Mar.
24, 2011).

27

alleged that a "meeting of the minds occurred" between Defendant Freestream and Defendant Melk (Doc. 1 at 17, ¶ 106), and that Defendants intentionally worked together to thwart Plaintiff's purchase of the Aircraft from PLL and then profit from their resale of the Aircraft to Blackjet.  Plaintiff has alleged several overt acts in furtherance of the alleged conspiracy, including that Defendant Freestream and Defendant Melk worked in concert to cause a fraudulent and unlawful FAA lien to be filed in order to induce Plaintiff to forego its purchase agreement with PLL.  Defendant Freestream's motion to dismiss Count IV for failure to state a claim is therefore DENIED.

### 5.    Whether Plaintiff Alleges a Plausible Claim of Promissory Estoppel (Count V).

Count V asserts a claim of promissory estoppel, alleging that "Defendants made multiple promises to pay [Plaintiff] if it would terminate its contract to purchase the Aircraft and withdraw its funds from escrow" and that "Defendants' promises should reasonably have been expected to induce an action or forbearance of a definite and substantial character on the part of [Plaintiff]."  *Id.* at 17, ¶¶ 110-11.  Defendant Freestream argues that it did not make any promises to Plaintiff, and that as a sophisticated actor, Plaintiff "could not reasonably or justifiably presume that a side agreement it had with a third-party" would form a legal obligation on the part of Defendant Freestream.  (Doc. 11 at 29.)  Defendant Freestream also argues that Plaintiff's remedy is at law, rendering equitable relief unavailable.

"Establishment of promissory estoppel requires (1) a promise on which the promisor reasonably expects the promisee to take action or forbearance of a substantial character; (2) the promise induced a definite and substantial action or forbearance; and (3) injustice can be avoided only through the enforcement of the promise."  *Green Mountain Inv. Corp. v. Flaim*, 807 A.2d 461, 464 (Vt. 2002).  "[T]he doctrine of promissory estoppel is applicable only where there is no agreement, where the promise is gratuitous, and there is unbargained-for reliance."  *Chomicky v. Buttolph*, 513 A.2d 1174, 1176 n.* (Vt. 1986).

The Complaint identifies two promises allegedly made by Defendants to pay Plaintiff $100,000 which were memorialized in the August 2015 Commission Agreement and the October 2015 Purchase and Sale Agreement and upon which Plaintiff allegedly relied to its detriment. The Complaint alleges that Defendant Melk's "alter ego" entities were parties to those two contracts. (Doc. 1 at 3, 8, 10, ¶¶ 13, 44, 59.) Whether Plaintiff's reliance on the identified promises was reasonable is generally determined by the trier of fact. *See STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011) (affirming arbitral award on fraud-based claims and noting that "reasonable reliance is often a question of fact for the jury rather than a question of law for the court"); *Marino v. Bank of Am. Home Loans*, 2013 WL 715611, at *7 (D. Vt. Feb. 27, 2013) (denying motion to dismiss fraudulent misrepresentation claim under Vermont law where defendant argued that plaintiff's reliance was unreasonable because "the relationship between the parties, [plaintiff's] level of sophistication, and the content of all relevant communications has not been fully presented to the Court").

Plaintiff's legal claims and remedies at law against Defendants do not preclude a claim of promissory estoppel at the pleading stage because Plaintiff is entitled to plead its claims and legal theories in the alternative. *See Stamp Tech, Inc. ex rel. Blair v. Ludall/Thermal Acoustical, Inc.*, 2009 VT 91, ¶ 16, 186 Vt. 369, 377, 987 A.2d 292, 297 (noting that a party "is, of course, entitled to plead different legal theories in the alternative"). Because Plaintiff has stated a claim for promissory estoppel, Defendant Freestream's motion to dismiss Count V is DENIED.

### 6. Whether Plaintiff Alleges a Plausible Claim of Unjust Enrichment (Count VI).

Plaintiff's final claim is for unjust enrichment. Defendant Freestream argues that the existence of the Commission Agreement precludes equitable relief. To state a claim under Vermont law for unjust enrichment, a plaintiff "must allege that a benefit was conferred on defendant, that defendant accepted the benefit, and that it would be inequitable to allow defendant to retain the benefit." *Johnson v. Harwood*, 2008 VT 4, ¶ 15, 183 Vt. 157, 166, 945 A.2d 875, 881. Unjust enrichment is a quasi-contractual

theory of liability, by which the law "implies a promise to pay when a party receives a benefit and retention of the benefit would be inequitable." *Brookside Mem'ls, Inc. v. Barre City*, 702 A.2d 47, 49 (Vt. 1997).

Plaintiff has plausibly alleged that it conferred a benefit upon Defendant Freestream by terminating its contract to purchase the Aircraft, which Defendant Freestream accepted. Plaintiff has also plausibly alleged that Defendant Freestream acted fraudulently and in concert with Defendant Melk to improperly induce Plaintiff to relinquish its claim to the Aircraft, rendering it inequitable for Defendant Freestream to retain the benefits of its own resale of the Aircraft to Blackjet.

Similar to Plaintiff's promissory estoppel claim, the existence of a contract does not warrant dismissal of Plaintiff's unjust enrichment claim because Plaintiff may plead its claims in alternative. In the event Plaintiff's adequate recovery at law is established, Plaintiff's equitable claims will be dismissed. *See, e.g.*, *Schwartz v. Schwartz*, 2014 WL 6390316, at *4 (E.D.N.Y. Nov. 17, 2014) ("As for the claims seeking equitable relief, . . . [u]pon consideration, the Court denies the motion at this time without prejudice. Such claims may be dismissed should it be determined that plaintiff has an adequate remedy at law."). Defendant Freestream's motion to dismiss Count VI for failure to state a claim is therefore DENIED.

## CONCLUSION

For the foregoing reasons, the court DENIES Defendant Freestream's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), 12(b)(3), and 12(b)(6) (Doc. 11). The court DENIES AS MOOT Plaintiff's motion for leave to amend (Doc. 19).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _7th_ day of December, 2016.

Christina Reiss, Chief Judge
United States District Court